your Mr. Holmes. May it please the court. There are three issues I want to talk about in this case, but the first one being discovery. And as I read the briefs in this case, looking at it fresh for another time, it occurred to me that there's something that may be of interest to the court that goes beyond strictly the facts of the case, although it's rare. And that is the, you know, the rising practice of letters that are being submitted to district court judges instead of motions. Now of course, all of us in our prior practice were used to the idea you file a motion to compel, it gets set, it gets decided. And there's nothing wrong with the new practice. Certainly we welcomed it as practicing attorneys when you have judges saying instead of filing a motion, send us a letter and we'll set up a conference. I've had judges who have set a conference within 48 hours after the letter is filed. Everything gets worked out. That is good judicial administration. But there are two issues that get raised by this practice. And I'll add, there's a whole diversity of this. This was Judge Rosenthal's court, but she was not the innovator by any means. Judge Hanks has been doing it for years. He's now in Houston. His replacement, Galveston, Judge Brown, does the same thing. I believe Judge Werlein did it. I have a great judge, Reno, does it. The procedures all differ. But one issue that you're going to have, which fortunately is not really raised by this case, is how do you get these letters in the record? Because most of these judges are requiring that it be sent to the case manager. I foresaw that issue and put the letters into the record as part of my 56D motion. So you have them. But the second issue is how do these things get properly docketed? They aren't tracked as motions. I know there are procedures within the district courts to set, in the case of a motion to compel, to set a submission date. It's going to be decided. There is tracking within the courts as to how they're going to be decided. But in a case like this, when you have a letter, that does not appear to happen. Judge Rosenthal is certainly not the kind of judge who's going to let something slip. But it did here. And I filed my letter asking for discovery. When I got no response, nothing happened, I filed a, sent in an email saying, can you at least acknowledge that it's there? Then I raised it as a 56D motion. And then Judge Rosenthal said you didn't try hard enough. That's not exactly what she said. But you didn't bring it to my attention enough times. If it's a motion to compel, I don't have to do that at all. So I have a motion that is on file. Yeah, but you filed it after the deadline, didn't you? After the discovery cutoff. There was no motion deadline. It was timely. Well, if discovery is cut off at a certain date, I always thought that that meant that you had discovery, that you would have filed your motion to compel before that date. I would have, maybe I'm wrong. There's no non-dispositive motion deadline. And certainly Judge Rosenthal did not say that my motion was untimely. And the motion to compel, there was no motion. You didn't file a motion, you just filed a motion. I'm talking about a 56D motion that came with the summary judgment. Oh. Yeah, right. Right. My letter, it was not, there was no deadline set in the scheduling order that required me to submit. Any specific facts that you needed to know and that this discovery would present for you? Yes. Where were the facts? Yes, we were looking, well, I laid it out in the brief a little bit more, but just in brief, number one, we were looking. Yes, yes, it was in the letter. And the number one, I was looking for the record of the investigation that was conducted after Mr. January complained and raised his issues about the ADA and so forth. The city brought in an outside attorney, Mr. Cassell, to do an investigation and interview people. And that's relevant in a number of ways. In terms of the complaint, that's the one, the point I've made in the brief. You know, this issue's been raised about whether the chief knew about the complaints. But when you've had an investigation going on, you've had an investigator going around City Hall interviewing people about it. And when the chief himself is named in the PowerPoint that they're investigating, that would certainly, the investigative file would show knowledge, for one thing. It would show what other witnesses said about the claims. This was not something that was going to be subject to work product, because this was not being done in anticipation of litigation. There was no litigation at the time. It's not attorney-client privilege, just because it's an attorney, because the attorney- client privilege is limited to things such as assistance with legal proceeding or securing legal services. When an attorney talks to a fireman and says, what happened? That's not privilege by itself. But regardless, those issues weren't litigated. The second thing we were looking for related to Brenda Poe, who is the city secretary. That is a position within a city in Texas. So she is a city official. She was one of the people who complained that Mr. January behaved inappropriately. Well, we know from newspaper articles, actually, that she subsequently was fired, because it turned out she'd made a recording of Mr. January. And that she then, there were proceedings, HR memos, all of which are mentioned in the newspaper, but we've not seen them. Why didn't you subpoena her? Well, all I wanted to do was to get, specifically, the major thing I wanted was the recording, which she wouldn't have. Well, if she was, well excuse me, I mean, if she was fired, she's probably more favorable to your client than the city, and therefore, had you deposed her, she would have said, oh, he was as polite as could be. That's all a misunderstanding. Well, we have her testimony from the TWC on things like that, where she was at the unemployment proceeding. We quote her testimony. That's why I didn't feel the need to depose her, because we already had her sworn testimony, which we thought was actually fairly favorable to us, that she said that she did not feel threatened by Mr. January, but rather she felt that the city was threatened, which it was. Yes. I mean, not threatened in a physical way, but threatened in a lawsuit way. Right. Which is what Mr. January was doing, right? Right. That's exactly, that goes directly to a retaliation claim, because that's the protected activity. If the city is pushing back on feeling that it's threatened with an EEOC claim, which is what they're talking about, that's exactly what you cannot retaliate against. Now, if he was saying, I'm going to go burn your building down, well, that's a crime, but aside from that, but if he was something that was not protected, that's a different ballgame. But he was specifically saying to her, I'm going after the city for what they've done to me, I'm going to go to the EEOC. She admitted she didn't think he was trying to attack her, either physically or sort of, I don't know, personally. Yeah, verbally. He was not cussing at her or anything like that. But the fact that she actually had a, she had actually recorded him, that would certainly be relevant. It would be relevant to see what her EEOC charge said. It would be relevant to see what these internal documents referred to in the newspaper. I don't understand why you say she didn't have possession of the recording. Well, I would assume, maybe wrongly, but I assumed at the time that she would have been required to turn that over. Well, most people make recordings on their cell phones now, don't they? I don't know how she made the recording, because we never even got that far. But in any event, no, I did not take her deposition, I did not subpoena her. We sought the information from the city, which should have had it, and we should have been able to get it from them. You know, with 20-20 hindsight, there might have been other ways I could have gotten it. But then again, when I sent my letter to Judge Rosenthal, I thought we were going to be winding up getting it from the city. Because they most assuredly had it. I thought we were going to have a conference, and you all would sit around and say, okay, we'll turn over this, but we won't turn over that, and so on and so forth. I mean, I was a state district judge. I did thousands of hearings on discovery, so I'm well aware of how that goes. We don't get as much of it up here, but I'm well aware of kind of how that goes when you actually make the lawyers talk to each other instead of pretend that they talk to each other. I wish I could quote you on that, some of that, because that's exactly. . . We as practicing lawyers, as much as you hated ruling on discovery motions, or I assume you did. I didn't hate it. It was just there was a lot of it, and a lot of times they had said in the conference section that, oh, we conferred, but their conference was sending a fax saying, do you agree that you've done everything wrong, and the fax comes back no. That's obviously not a true conference. That's my life. I'll get three-page letters challenging every objection I've made, everything I've said, and do you now admit that you're a communist, basically? Yeah. But as much as judges don't like, most judges don't like doing that, I don't like filing discovery motions myself. Well, why not write to the magistrate judge? Because I thought they're the ones who handle. . . I mean, I know they're the ones who handle most of the discovery. Yeah, this case was not referred to the magistrate. In fact, we were mediating with Judge Shelton. Oh, that was it. Okay. So we couldn't have gone. . . I mean, but this is Houston. There's more than one magistrate judge. Yeah, but they're assigned to judges. But the court, I thought the court did find that this was pretty much untimely because you'd had ten months extra for discovery, and you could certainly have brought it up before then. What she said was that I didn't. . . Diligently pursue discovery. No, she said I didn't remind her, actually. She said that, which is something. . . You had definitely done discovery on this. You just hadn't received it. Right. Okay. I had submitted the discovery. What Judge Rosenthal said was, I'm paraphrasing her, and I don't mean to come off wrong, but she basically said you filed your letter, but then you didn't follow up with me, which I did. I actually did. You followed up with the e-mail. Yes. So I did follow up. But again, all that was in the context of there was a date for dispositive motions, was there not? Yes. And you're coming up after the date. Before. 56D. That's a. . . Okay. That's a timeline. That's fair enough. We had filed. . . We had sent in our letter for discovery. I had sent the follow-up. Then the dispositive motion got filed, and I filed the. . . I raised it again in Rule 5016, so that was the third time I raised it, not the first or the second. And your point at the beginning of this argument is that the world in which a motion had to be filed has kind of flopped a little into a letter. Yes. Okay. But the point you're saying is it's the same. We were raising the problem. We've been trying to get this discovery, and they've turned off their fax machine. I'm joking. I know faxes aren't what we do these days. But in my day, that's what we did. Well, Judge Rosenthal, everyone knows that she's a very good judge. But things happen. For the best of judges, this slipped through the cracks. I don't know why. But I never did get my conference. I never did get a chance to raise these issues. And ultimately, the motion got filed, and again, I still didn't get a ruling, except that you . . . All right. Well, let's turn away from the discovery because we've got the issue of the retaliation. Right. And they're saying, look, your client showed up drunk and messed up and whatever, and we just . . . he'd already had one issue before with taking those drugs. And so, we had to fire him. How do you respond to that? Well, two things. First of all, starting off with what the judge said again was that she thought that was reasonable and believable. I guess as a comment there, if an employer cannot come up with a reasonable, believable explanation for what they've done in one of my cases . . . In other words, if their explanation for what they did is unreasonable and unbelievable, we're never going to get to summary judgment. The opposing counsel is going to come up to me, put his arm around me and say, Dave, let's work this out. I mean, the employer is always, in these cases, is always going to have a reasonable, believable explanation. And there are aspects of this that probably are reasonable and believable. But we presented quite a bit of evidence in this case, showing at least that some of the things they said . . . You raised a fact issue. Yes. Reasonable, believable. And one of those is the video, right? Right. Because he's sitting there so calmly. I don't know that I've ever seen anybody drunk that's that calm unless they're asleep. And they say they were telling him to leave and he refused to leave. That didn't happen. He was kidding as well. I mean that . . . But he was so polite. His wife showed up and started screaming. She wasn't particularly polite, but he was polite. Right. I was actually surprised at how polite he was. Yeah, that's . . . So, are you saying you think the jury then could believe him because he was sitting there calmly, politely, talking, explaining, so on? And that some . . . Is that the contention? How could he possibly have had a valid EEOC complaint? Oh, okay. The . . . I'm not disagreeing with my colleague here, but I'm just going before that. The whole point of retaliation is retaliating because he's going to sue them for disability discrimination when his work rule was, if you don't feel good, don't come in. I don't see how an employer could possibly grant more accommodation to a fellow in Mr. January's position. It wasn't an accommodation issue, though, that he was really complaining about. What he was complaining about is that he was bumped out of his position as training officer, bumped down to being an ordinary fireman, and he felt that this was because of his disability. So, that's the accommodation issue, which Judge Rose . . . That's the claim he made that you think they retaliated on. Right. Because he was specifically blaming some of the city officials. He just has to make a reasonable claim. He doesn't have to win on that to be able to show retaliation. Yes, reasonable belief. But, Judge Hisseman, was his salary going to be changed? I think so. I'm not 100 percent sure about that off the top of my head, but losing his position as a training officer, I think, may have affected his salary. But, even if it didn't, from his point of view, he was being bumped to a less prestigious, less desirable position. As to whether there would be damages out of it is different than whether you would have an EEOC claim. All right. Thank you. You have time for rebuttal. We'll hear from Mr. Halfond. Thank you, and good morning. Bill Halfond for the City of Huntsville. May it please the Court. Let me start where the Court started with the appellant. In response to Judge Jones' question, yes, in fact, the discovery letter was first sent to eight days after the time that the district court had extended three times for the benefit of the appellant. Because of the appellant's claim that he was too sick to attend the completion of his deposition. The extended discovery deadline was March 2, 2022. The letter was first sent March 10, 2022. Can you cite where Judge Rosenthal made her decision based on that, on the eight days after? Yes. Yes, that's at record page 628. She says that's not the case. That's at 628 in the record. And it also demonstrates that the problem here, with respect to my friend on behalf of the appellant, is not the Court's letter procedure. The problem here is that the appellant, like so many people who are faced with the prospect of summary judgment, tries to throw a little hook in and say, now, and this is what actually is in the 56D motion. If the Court thinks it might grant summary judgment, then let me have some more discovery. And that really answers the question. As the district judge explained, not only was the letter untimely, but also at record 628, the district court pointed out that counsel for both parties had two conferences with the Court's magistrate judge. And as I think Judge Hainfield— But the letter was before there was a motion for summary judgment. Yes, I'm sorry. The letter was after the discovery period had closed. And then the 56— Can you cite me the Southern District of Texas rule that says you have to file your discovery motions before the end of discovery? I'm not—I don't know the local rules well enough to give you the citation to that. But Judge Rosenthal attached significance to that. And, of course, she has broad discretion to address these questions. And, moreover, beyond that, the Court pointed— I don't know that she has broad discretion to set a deadline that isn't there, so that's why I'm asking. Well, Rule 56D, right? Right. The issue, even if it were never raised in a discovery motion, it can be raised in Rule 56D, and that does, according to this Court, vest the Court with a significant amount of broad discretion. Right. But we were talking about timeliness, not type of document. And the March 10 letter was before your summary judgment, and then there was a follow-up email, and then there was the 56D. And what Your Honor said is the timeline is correct, but this is not—the trial court did not rule on this based solely upon the timing. Okay. So let's talk about that. Why shouldn't you have to turn over the recording that the city secretary made? I'm sorry, what was the question, Judge? Why wouldn't you have to turn over the recording that the city secretary made? Well, the district court found that it was both irrelevant and subject to a party privilege. And so—but if I could— Talking to her at the building, not discoverable. Well, I'd have to go back to the briefing, Judge, on that issue, because I don't have that here. That's not raised up here, right? The question of the propriety of the ruling is not before the court. But if I could, I'm trying to answer your question. The district judge made that— Well, discovery is an issue on appeal, so that's why I'm asking about it. Well, no, the issue of discovery here is a 56D motion, not all discovery. There's no discovery dispute pending before this court. No, I understand that, but the 56D is raising the need for the discovery, so then we're talking about why would you not give that, and I'm not understanding that. Well, respectfully, I think those are two different things. Whether there's a need for discovery under 56D is the first question. And then if the court finds that additional discovery is appropriate, then the district court has to make a determination as to what discovery that is and what's privileged and what's— So you're saying if we were to find the 56D should have been granted, we just send it back and we don't comment on it? Absolutely. Okay. Because the district court would have to take up that issue in a broader context. But, again, to put— But it just kind of seems to me if that recording benefited you all, you would have produced it, and that's why I'm wondering, even if I'm—it's not— maybe you're saying I'm not supposed to wonder, but I do wonder. Because the video we do have I think is supportive of Mr. January and not of you all. I appreciate the court's comment, but I do want to put into context here that, as the district court explained, the problem here is not the letter because counsel for both parties appeared before the magistrate, Judge Sheldon, on two occasions after the letter, after counsel had written the letter, without raising that issue to Judge Sheldon. I think Your Honor asked, in the Southern District, the magistrate judge is assigned by the judge, so we all know who is the district judge's magistrate judge. And, in fact, Judge Sheldon was participating in the case as a settlement facilitator but, of course, is always the magistrate judge. All of this— But, I mean, if you felt like the magistrate judge had a conflict, what I was saying is the Southern District of Texas in Houston has more magistrate judges than someone else could have been used, right, if there wasn't— Oh, no doubt, no doubt, and that's obviously within the court— That was the only point I was making. Yes, Your Honor, I understand. But to be clear, because this is a 56D motion and not a discovery motion, the question is first vested in the broad discretion of the trial court, but, more importantly, there must be evidence from which, in reviewing that question, which is the question before this court, that this court would find that there is a plausible basis to believe that additional facts would influence the outcome of the summary judgment. And I'm sorry to have taken you on this long tour, but the answer to that is quite simple, and it turns out it's not—it doesn't influence the summary judgment at all because at page 628, in addressing the 56D motion, the district judge explained the court was not denying— not on the appellant's failure to adduce evidence that he claimed he needed, but rather on information completely in the appellant's own sphere of knowledge on which he failed to present any evidence, and that was, and I'm quoting, failed to request an accommodation, which is a fact he has in his personal knowledge and he could have disputed at summary judgment, failed to establish there's a link between his disability or protected activities and his ultimate firing, and failed to establish that Director Lunsford's decision to terminate him, based on the knowledge that Director Lunsford had at the time, was pretextual. Now, again, if you indulge just for the moment the idea that there's something about the audio recording or the other things that the appellant said that he needed, none of those speak to the issues that were before the district court. And so on the issue of the question of whether any of that evidence would have influenced. The problem is you can seldom show what your opponent was thinking, and so you have to kind of show what they knew. And part of that is if he had reviewed the recording that the city secretary made and it showed he wasn't drunk, it showed he wasn't threatening her, he was just threatening the city, which is totally appropriate as long as it's not kind of a physical threat, it's a lawsuit threat, then doesn't that change things? No, not at all. At least not retaliation? Not at all for several reasons. First of all, just to be clear, it's not a video recording. To my understanding, it's an audio recording. So it wouldn't show anything except to the extent that we maybe use the term show in a broader sense. But it doesn't show that Director Lunsford was aware of or reviewed that recording. But, again, that's not why the gentleman was fired. The gentleman was fired because he came to the court, and you'd only go back to the reasons given, and I'll give you a record set on that, the reasons given for the firing. 145 to 148, he wasn't fired because of what he said to Ms. Poe. That was certainly part of the res geste of the entire inappropriate conduct and the event that led to his firing. But as Your Honor observed when Counsel for Appellant was standing here, Mr. January was under and agreed to a significant restriction on the potential for his being fired. That is, he was on what they might call an animal house, double secret probation. So that event when he showed up for the EEOC copies that he said he was there for was a fairly significant event in all of this, right? Well, not why he was there, but the way that he acted, yes. Yes. Well, no, he thinks it is why he was there that he was sued, and you all think it's the way he acted. And that's why I'm wondering, why isn't that really a fact issue? For example, when you review the video, you hear his version of what happened, you hear their version. Why isn't that a fact issue? Because you can always say it was done for X, but it was really done for Y. And that, yes, there can be cases where summary judgment is properly granted on that. But here there seems to be a core dispute, particularly with that video that we do have. Well, let me say, first of all, it's the video. The video is the gentleman sitting in the conference room after he's been basically subdued by police officers who were sent to City Hall. So his affect at that time does not reveal his conduct. All I see is them walking through, and then they show up and video him, and they're not shouting, but they're attacking him verbally, and he's being very politely responsive. I want to answer the court's question, though. Why isn't what he thinks sufficient to raise a fact? Not what he thinks, but what there is some evidence of. I mean, your argument sort of is anytime somebody is fired, even after they've shown up for an EEOC evidence because they're going to file an EEOC claim, they're not going to be able to sue for retaliation. I mean, what evidence would there need to be to support a retaliation claim? Because you seem to think as long as the guy gives a reason that's other than retaliation, we're done. Well, they swore under oath to what their reasons were, so that's evidence. And if I may add, the reasons given— Okay, but do you have to believe the guy? Well, the reasons given were not only sworn, as Judge Jones pointed out, they were not only sworn, but they were contemporaneous with the firing. So it isn't the fact that they found out that Mr. January filed a lawsuit and then came up with some reasons to fire him. And none of the reasons—I think this is where maybe I'm disconnecting, Judge, and I apologize if I'm not being clear—they're not the things Your Honor is talking about. At 145 to 148, what Director Lunsford explains to Mr. January is, first of all, recall that Mr. January was required to take a test for inappropriate substances on demand. That was part of his agreement. And yet during the encounter—this is on the video— the first point that Director Lunsford points to is that Mr. January repeatedly refused offers to take a horizontal gaze dystagmus evaluation or a urinalysis. The mere refusal, Judge, regardless of what it would have shown, violates the agreement the man made with the director when he was brought back to work after his inappropriate efforts to obtain drugs. Second, your interactions, actions, and reactions while at City Hall were not typical of high expectations of a firefighter. You were insubordinate by ignoring responsible officials because he was told to leave City Hall three different times while in the city's manager's office. They offered him a ride and he refused to leave. Lastly was Ms. Poe's report of being intimidated. So the hypothetical that Your Honor is posing is not the facts of the— Yeah, but in that video he's just saying, I'll get my wife, and he called his wife, and she showed up within a few minutes. So that doesn't seem like, you know, he was refusing to leave and running around and all of that. He sat there calmly, got his wife, his wife showed up. She was pretty angry, but she showed up. Well, and so the question before this Court is not whether you agree with Director Lunsford's decision, but whether Director Lunsford's decision is false. That's the question. Because in— Well, I'm questioning whether it's reasonable, the thing about the ride. I understand your other point about the mere refusal to take the test. I understand that argument, but the one about the ride doesn't seem consistent with what's on the video. Well, again, the Director gave four reasons, and the question—so the question isn't one in isolation. It's any one of those four. But I have to respectfully quarrel with the use of the term reasonable here as well. The issue before this Court is not whether Director Lunsford's decision was a reasonable one. It's whether the appellant has proven it is literally a false one, and that he has not done. And that, as judge— Well, he has to raise a fact issue. He doesn't have to prove it right now. He has to raise a fact issue. He has to present some evidence from which a jury could find that it's false. And, again, with due respect to Your Honor's question to appellant's counsel, it's not simply that the jury could disbelieve Director Lunsford's reasons. There has to be evidence on which the jury could fix a finding that it is actually false. That's St. Mary's Honor Center v. Hicks, and this Court's opinion in Salazar v. Lubbock County Hospital District, both at page 43. Under St. Mary's, to avoid summary judgment, the appellant has to present evidence, one, that the reason is actually false. Now you have four here. And if Your Honor discounts one or more, if any one of those is not false, and that is there's no evidence to demonstrate the falsity of that, then summary judgment is appropriate. Of course, the other issue is there has to be evidence that the discrimination or retaliation was actually Director Lunsford's motivation. And that failed because the undisputed record evidence that the district court found demonstrates that Director Lunsford was not aware of Mr. January's report of his discontent about not being the fire chief based upon some alleged disability, which, by the way, the record shows was never established at any time during the gentleman's employment. And, in fact, when he made that complaint to the city manager, the city manager gave Mr. January documentation regarding confirming the existence of a disability as well as asking for an accommodation, in response to which, the record shows, Mr. January wrote and said, I don't want an accommodation. I don't need an accommodation. And, therefore, he also didn't demonstrate the existence of a disability. The other is the EEOC filing. The record evidence, as the district judge pointed out, fails to show that Director Lunsford even knew of the EEOC filing. That's at 639 and 640 in the record. But he knew there was going to be one. I beg your pardon, Judge? I didn't hear you. He knew there was going to be one because why did he show up to the building that day that there was all that controversy? He showed up at the building because of a disturbance at the building. There's no evidence that he was told there was or was going to be an EEOC filing. No, no, I'm saying why January showed up at that building. Mr. January knew there was going to be an EEOC filing. Right, but that's what he was there for. And the notion that the guy who fires him had no idea why he was there, how is that believable? Respectfully, Judge, I think that's the problem. The question isn't whether it's believable. It's whether there's evidence in the record. Isn't that for pretext it does need to be believable? No, no, I'm sorry, Judge. For pretext, under this Court's opinion in Salazar and the Supreme Court's opinion in St. Mary's Honor Center, both are cited at page 43, the evidence must show it's a false reason, not a believable reason or non-believable reason. It has to be demonstrated to be a false reason, and then it has to be shown to be that the true reason is discrimination or retaliation, and that is missing here. And, again, the district court, with all due respect to the district court, could not deny summary judgment on the question that Your Honor is raising. Could a jury believe, contrary to everything in the record, that maybe Chief Lunsford is lying? No, I mean the whole process of discovery, including the deposition of Chief Lunsford, is to determine whether there's any evidence contrary to what, as Judge Jones pointed out, Chief Lunsford wrote when he fired the gentleman and then affirmed under the penalty of perjury when he testified to it. So it would turn the summary judgment standard on its head if we said, well, if people just didn't believe the record evidence, then we would deny a summary judgment. So, respectfully, I would differ with that. The evidence here is, as the district court amply demonstrated, in a very well-reasoned and very explained opinion, not atypical of this district judge, that there is simply no evidence from which the court could find that Director Lunsford knew of these alleged bases for retaliation or that he acted. I mean you quoted her saying his findings, his reason for making his findings were believable. You quoted that. I'm sorry, Judge, I don't know where that is. I mean you keep saying believable doesn't matter, but believable is out there in this case. You're acting like it's not. I'm sorry. I don't mean to act like it's not. I'm saying the summary judgment standard under 56C is more than simply whether the evidence is believable. It's whether the court is presented with conflicting evidence. But if the district court relied on that, do we not review what the district court found? I realize summary judgments are questions of law, but isn't that relevant to the matter? I mean you're acting like believable doesn't matter, but it's all over. Everything I'm looking at in my notes, it's all over the place. I don't know the context, Judge. I think believable, obviously. I mean the district court is not required to believe something that is truly unbelievable or incredible. Explain your position. Thank you. Thank you for the time, Judge. Okay, Mr. Holmes. It doesn't matter ultimately what Lunsford knew or did not know about EEOC because this fellow was fired because he refused a drug test and he refused to leave the building, and irrespective of what a partial video shows, there is testimony that Ms. Poe felt intimidated. Well, first of all. Isn't that sufficient to support the district court's opinion? Well, if that was unrebutted, yes, it would. But number one, Chief Lunsford testified before the TWC that he did not offer a drug test to Mr. Somebody did. No, what they offered was this. Nystagma. Right, and he turned that down. And put yourself in that position. If there's somebody out there who you think is out to get you, who you are about to go to the EEOC based on their conduct, that's true of Chief Lunsford. And I must have misspoken. I was corrected, I believe, inferentially. So he was going to go to the EEOC because they didn't make him chief. Is that right? No, it was really more about the training officer issue. Well, either one. Okay. Because they didn't keep him in an elevated position. Yeah, he had been a training officer and an assistant chief maybe, or captain. I think it was captain. And they bumped him down to regular firefighter. That was his major issue at the time. There were other things out there. He had applied to become chief and so forth. I mean, there were more, as has often come true. And then he tried to quit and then he changed his mind. Right. There's always a lot of moving parts in these cases. But the specific thing that he was complaining about, his number one objection, was the fact that he had lost the training officer position and that he was no longer a captain. But you're saying he wasn't offered a drug test. He was just, they kept wanting to scan his eye. I mean, I saw that on the video. What is your view of this whole believable discussion I had with your opponent? Well, I think a good way of looking at it is the rule from the U.S. Supreme Court that this court has followed, which is when you are looking at the evidence in a case like this, you should disregard anything presented by the moving party. Here's the city of Huntsville, that the jury is not required to believe. That's looked at in Reeves. And I think the case in this court was, if I wrote it down, Taylor Travis. I don't think anybody's arguing about the law here. I think the question is about the facts. And he was shortly, soon afterwards, told that he was fired. He had made an agreement that he would never refuse a drug test, right? And that if he stepped out of line once, he would be subject to being fired. I don't know if that's actually, I'm not sure that that was actually part of the agreement. Well, it was a pretty serious warning. Yeah, three years earlier. That's true. Notice that that was not one of the grounds for his termination, however, in fact. That's something that's been raised really. But that's not a pretext. That is part of the background fact of his employment. Right. There's no pretext about that. Right. And if they'd offered him an actual drug test and he'd refused it, they could have done it. A nystagma test substitutes for drugs, doesn't it? I mean, if you're under the influence of drugs, your pupils, I forget whether they expand or they contract. That's one thing, yeah. But it's more subjective. That's the problem, right, than just taking an actual drug test. Yeah, and the next morning he went. Not subjective. Well, he shouldn't have worried about that because he says, oh, well, I hadn't been able to sleep for four days. Right. So if he wasn't under the influence of anything and he had just been unable to sleep for four days for whatever reason, there was no reason to object to that. Except that, again, once again we have the disability issue, which is his gallbladder problem. Gallbladder isn't the question about not sleeping for four days. It can be. Unless a gallbladder causes something to happen to your pupils. Yeah, I think, well, actually, once again it does, and that's something he had told the city, which is it can make him appear to be on drugs because of the blood sugar issues and whatever else. He actually had that. Blood sugar is something that you cure by taking orange juice. I wouldn't know. Well, if you're diabetic and you start to faint from blood sugar problems, you do orange juice. He wasn't diabetic. I understand that. Maybe I've got it backwards. Okay. Well, go ahead and use a couple minutes and say whatever you're going to say. Well, I think I've largely wrapped it up. Making the points that I wanted to make, the only real point I had written down that I wanted to, or two of them that I wanted to touch on real quick, number one, counsel said that the discovery didn't speak to the issues. Now I want to go back to the investigation for a moment again. If there's going to be an issue as to whether Chief Lunsford knew about the complaints and so forth, the investigation is likely to be strong evidence of that. Did somebody talk to him about it? That would go right to the issue. And I would note here that this is kind of a reversal of the usual cat's paw issue. Usually it's the defendant coming in and saying, here's proof that the decision was made by a decision maker who knew nothing about anything and was completely removed, had no discriminatory intent, and I have to come in and prove that they were really a cat's paw for somebody lower in the chain. That's the Staub versus Proctor Hospital case in the Supreme Court. But here I'm being told that I have to prove this person was not a neutral, uninformed decision maker. It's putting the burden of proof on me to come forward and show that Chief Lunsford actually had knowledge of something, which is something that's not within my control. Well, excuse me, but you do have the burden of proof, and that's the problem. Yes. Right. The burden of proof of pretext. Right. And then the Bernanke case from the D.C. Circuit then speaks to that, which is my case is circumstantial. And as Her Honor pointed out, we've got a situation where there's been an investigation here where EEOC threats, all these things going on, and the argument is that, well, Chief Lunsford must not have known about it somehow. All I have to do is present enough evidence, circumstantial evidence, to create an inference. I don't need direct evidence. But then an investigation file might give me the direct evidence. So it is relevant. Okay. Thank you. Thank you. Yes. The Court will stand in recess for less than 10 minutes.